**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-355 (RBW)** |
| **v.** | : | |
| | : | |
| **THOMAS VINSON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Thomas Vinson, to three months' home detention, three years' probation, to include 60 hours of community service, and $500 in restitution.

### I.    Introduction

The defendant, Thomas Vinson, a field supervisor for an oil company, and his codefendant and wife, Lori Vinson,[1] (collectively, "the Vinsons" or "the defendants") participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

For his conduct that day, Thomas Vinson pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Picketing, and Demonstrating Inside a Capitol Building. The government afforded the defendant the opportunity to plead to that charge in part because it has no information

---

[1] A separate sentencing memorandum regarding Lori Vinson has been filed contemporaneously in this case.

that he personally committed violent or destructive offenses. But the Court must consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. Without his actions alongside so many others', the riot likely would have failed. *See United States v. Matthew Mazzocco*, 21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." (statement of Judge Chutkan)). After the riot, it appears the defendant may have attempted to destroy or conceal the worst evidence from inside the Capitol. Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification warrants significant periods of home detention and probation.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

The government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF No. 31, at ¶¶ 1–7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### *Lori and Thomas Vinson's Role in the January 6, 2021 Attack on the Capitol*

Lori and Thomas Vinson traveled to Washington, D.C., from their home in Kentucky to attend the "Stop the Steal" rally on January 6, 2021. On December 24, 2021, Thomas Vinson had posted on Facebook, "Room is booked for DC . . . I'm a Veteran who[se] Oath will NEVER expire, Stand Strong, and Stand Now! If you don't you May never have the chance again! Merry Christmas and plan Well! It Will be Wild! My President Proclaimed It So!"

After, the rally, they proceeded to the U.S. Capitol, where they posed for photographs and recorded video showing the crowd gathered outside the Capitol Building. Then, video recorded by another rioter shows Lori leading the way as they climb through scaffolding up to the Capitol Building.



At 2:13 p.m., rioters first breached the Senate Wing Door area by breaking out the glass in the windows and focusing open the doors from the inside:



Approximately five minutes after the entry depicted above, the Vinsons entered the U.S. Capitol through the Senate Door.



They turned to the right and walked past the shattered glass on the floor from the smashed-in window. In video recorded by Thomas and other rioters, alarms can be heard blaring as they chant with the crowd, "Our House!"



Video further shows that as they walked further into the building, Lori and Thomas encountered an individual standing in front of a doorway who said, "There's one guy in there and he's scared shitless and he has a fucking a gun . . . ." A woman's voice can be heard replying, "Let him shoot somebody, who gives a fuck!"

At approximately 2:25 p.m., a crowd filled into the Crypt and pushed back the line of officers protecting that area. As individuals at the front of the crowd assault officers, Lori and Thomas Vinson can be seen in the middle of crowd, with Thomas still holding his cell phone above his head.



The Vinsons pushed to the front of the crowd, with Lori directly at the police line. After a stand off lasting several minutes, the defendants rushed forward as officers were overwhelmed by the advancing crowd. *See* Exhibit 1.



At approximately 2:31 p.m., the Vinsons entered the "OAP Corridor" of the 1st Floor of the U.S. Capitol Building, where they were blocked from proceeding further by law enforcement. Thomas Vinson was still holding a cell phone above his head. A red bar indicating the phone was set to record video is visible at the top of the phone's screen.



As the officers walked backwards away from the crowd, the crowd – including Lori and Thomas Vinson – walked toward them.



At approximately 2:33 p.m., the Vinsons entered the Rotunda, where they used their phone to take photographs and record video for several minutes.

At approximately 2:37 p.m., Lori and Thomas Vinson exited the Rotunda but remained within the Capitol Building. They watched as a crowd pushed against the officers protecting the doors to the outside, where more rioters were attempting to enter the building, quickly overcoming the officers and forcing open the doors. Video recorded by Thomas captures part of the battle between rioters and police over this entry point. Alarms can be heard blaring as the crowd roars. *See* Exhibit 2.



At approximately 2:39 p.m., as even more rioters pushed inside the Capitol Building, the defendants simply walked back into the Rotunda. Phone location information indicates the defendants were inside the Capitol until approximately 2:50 p.m.

Both defendants have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they paraded, picketed, and demonstrated.

*Lori Vinson's Comments After the Attack on the Capitol*

Lori Vinson immediately began publicizing her participation in the riot. Public statements made by Lori Vinson after January 6, 2021, on Facebook include:

1.  Lori Vinson: "I was probably one of the first 100 in there and I would say at the most there were several thousand in there."

2.  Individual 1: "Lori Utley Vinson you went in the Capital??"

    Lori Vinson: "yes I did, That is exactly how I know what happened!"

3.  Lori Vinson: "I was not in every room.but I was in that building an to an hour in a half [sic]. Trump stands for the exact opposition of Biden. Which would love to see this

country a communist nation. He is a pedophile that wants to cover up all his son sick bullshit. But I guess that's ok?"

4. Lori Vinson: "You hear what main street media wants you to hear. I can tell you that they didn't stop us from going in. They stepped to the side and let us walk in. I have no idea what was going on outside but inside the only time any tear gas was used was when some idiots tried to tear shit up. The police didn't even have guns on them inside."

5. Lori Vinson: "We walked in with the police standing right there. There was No breaking going on."

6. Lori Vinson: "I was in the building."

   Individual 2: "lol I should have known u was up in there girl u aren't scared of anything lol"

   Lori Vinson: "LOL. Wasn't much to be scared of."

In direct messages after January 6, 2021, she told multiple people she would "do it again."

In addition, on January 8, 2021, Lori Vinson told an acquaintance in person that she and the defendant had entered the Capitol Building and showed that acquaintance photos and videos from inside. She claimed that the police had let her into the building, but the acquaintance was doubtful given the obvious signs of forceful entry in the photos and videos.

Shortly after the attack on the Capitol, Lori Vinson was let go from her job as a nurse at a medical center and began giving interviews to multiple news outlets across two states. On January 13, 2021, 44News in Evansville, IN, posted a video interview with Lori Vinson, where she defended her involvement in the incident at the U.S. Capitol. Specifically, she claimed that if she

and the defendant had met any resistance they would not have entered, and they were never asked to leave.[2]

On January 13, 2021, Fox17 News in Nashville, TN, posted a different video interview with Lori Vinson where she discussed her involvement in the incident at the U.S. Capitol on January 6, 2021.[3] The news story included video and pictures from January 6, 2021, that Lori Vinson had provided. In the interview, she discussed being fired and stated, "I felt like what I had done was justified, and so I just said I would do this all over again tomorrow, I'm sorry that you don't see my worth." According to the news report, Lori Vinson provided a video she took while entering the U.S. Capitol in which blaring alarms and loud chanting can be heard, but in the interview she said the doors were open and people were filing in and "there was no signs" and repeated her claim that if she had met some sort of resistance, she would have never entered the building.

On January 14, 2021, 14News in Evansville, IN, posted a video on their website featuring a news story and yet another interview with Lori Vinson.[4]

---

[2] The video of the interview is available here:
https://www.wevv.com/content/video/573588422.html.

[3] The video of the interview is available here: https://fox17.com/news/local/kentucky-nurse-fired-for-entering-us-capitol-during-riot.

[4] The video of the interview is available here: https://www.14news.com/2021/01/15/ascension-st-vincent-nurse-loses-job-involvement-us-capitol-riots/



During the interview, Lori Vinson acknowledged her involvement in the incident at the U.S. Capitol on January 6, 2021. Speaking to the camera, Lori Vinson said, "I hope that is something I remember and say, 'I'm glad I was a part of that' thirty years from now." She added, "People have asked are you sorry that you done that, absolutely I am not, I am not sorry for that, I would do it again tomorrow," and that "I felt like I've done nothing wrong and I wouldn't change it." The news story included video provided by Lori Vinson that was taken from inside the U.S. Capitol building on January 6, 2021, and features blaring alarms and multiple individuals chanting.

*Lori and Thomas Vinson's FBI Interview*

On January 8, 2021, the defendants were interviewed at the same time by law enforcement in a recorded telephone call. During the call, Lori Vinson acknowledged she and the defendant entered the U.S. Capitol on January 6, 2021, but claimed they were "let in" and did not "bust in." She admitted she posted about entering the U.S. Capitol on Facebook and said that they were one of the first one hundred people inside. She also indicated that she and Thomas Vinson attended a rally near the White House lawn and walked straight to the U.S. Capitol, ultimately following a stream of people inside. She denied they were waiting outside for someone to break down the doors or windows to get in and claimed they did not meet any kind of resistance while entering. She further stated that police officers did not ask them to leave. According to Lori Vinson, they

also witnessed a person hitting a door with U.S. Senator Mitch McConnell's name on it with a crowd control stanchion three times. After seeing that, they decided to leave.

Thomas Vinson added that he also saw a person throw a water bottle and said they should not do that. He further stated they went to the Capitol as a "peaceful bunch of people there to express their views to Congress…," describing their conduct mainly as chanting and talking, and asserting that they did not damage or take anything.

*Second FBI Interview with Lori Vinson*

On January 15, 2021, Lori Vinson was re-interviewed and acknowledged she was featured in a local news story and indicated she entered on the Rotunda level and stayed on the same floor. She further claimed she knew there was something going on related to the certification of the electoral votes on January 6, 2021, but did not know that Congress was "in session" at that time and claimed that she expected that no Congressional officials would be in the building because they certainly would not have been allowed entry if they were in session. She also claimed that she did not hear the alarms going off inside the Capitol building during her initial entry into the Capitol but noticed it after recently reviewing the video. She provided law enforcement with one photo of her inside the Rotunda but did not provide law enforcement with the additional photos and videos from inside the U.S. Capitol that she provided to news outlets.

*Charges, Arrest, and Post-Arrest Cooperation*

On February 22, 2021, the defendants were charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G), and on February 23, 2021, they were arrested in Kentucky and immediately retained an attorney. A search warrant had also been issued for the defendants' electronic devices but was not executed. Lori Vinson provided her phone to be imaged pursuant to a consent to search form, in which she withheld consent for any

communications between her and the defendant, asserting marital privilege. Thomas Vinson stated to investigators that the phone he had used at the Capitol had been replaced due to damage. Phone records demonstrated that his registered device changed from an iPhone 8 to an iPhone 12 on January 16, 2021. Later, at the government's request, Lori Vinson consented to a fulsome search of the image of her phone, and Thomas Vinson provided his new phone (which contained information from his old phone) to investigators to conduct a physical search. Through his attorney, Thomas Vinson also provided several videos and photographs taken at the Capitol on January 6, 2021. No videos consistent with the recordings captured on CCTV as described above were provided; one video showing the defendants entering the Capitol was observed on his phone during the physical search. Through counsel, Thomas Vinson represented that he thought he was recording, but when he checked later he apparently did not hit the record button. As noted above, the CCTV shows clearly that the phone is set to record video at some point during the riot. Facebook records gathered pursuant to a search warrant revealed some (but not all) video consistent with the CCTV footage, which had been sent from Thomas Vinson's account to Lori Vinson's account after January 6, 2021.

*Plea Agreement*

On May 12, 2021, the defendants were charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 27, 2021, Thomas Vinson pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Picketing, and Demonstrating in a Capitol Building. The government

agreed to dismiss the remaining counts in the Information at sentencing. By plea agreement, the defendant agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Thomas Vinson now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). As set forth below, the Section 3553(a) factors weigh in favor of the government's recommendation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are neither exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The defendant entered the building approximately five minutes after it was first breached at his location of entry. While no police officers directly blocked his path, there were clear signs of violent entry. The window adjacent to the door through which the defendants passed had just

been smashed out. The defendants walked by a pile of shattered glass on the ground as they moved deeper into the U.S. Capitol. They heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm, and they knew tear gas had been deployed. Most importantly, they saw officers being attacked in the Crypt and at the Rotunda doors, and were part of the crowd that continued to press forward despite this obvious dangerous and unlawful conduct toward law enforcement. In fact, Thomas Vinson recorded these attacks. Such callousness must not be taken lightly.

Unlike Lori Vinson, the defendant did not publish misleading and false statements on social media or the news after January 6, 2021, and his statements to law enforcement involved less minimization than his co-defendant's. However, he stood by, on the same call, while his co-defendant misled the FBI. As noted above, Lori Vinson showed no remorse for her conduct, but asserted numerous falsehoods and mischaracterizations to justify her behavior. She claimed that they were "let in" by police officers – a claim for which there is no support in the evidence uncovered during the government's investigation – and encountered no "resistance" – a blatant mischaracterization of the circumstances of her entry into the U.S. Capitol. Providing misleading information to the FBI meets no definition of cooperation.

**B.  The History and Characteristics of the Defendant**

Thomas Vinson is employed as a field supervisor at Country Mark, an oil company, and has been so employed for many years. Final Presentence Investigation Report ("PSR"), ECF No. 41, at ¶ 53. The defendant also served in the U.S. Air Force from 1984 to 1988. While laudable, his military service renders his decision to storm a protected government building during a Constitutional proceeding all the more shocking – and egregious. As set forth in the PSR, the defendant has two convictions for operating a vehicle while under the influence from 1992 and

1996, respectively. *Id.* at ¶¶ 24–31. He has been compliant thus far with the conditions of his

pretrial release. *Id.* at ¶ 8. If the Sentencing Guidelines applied to his offense of conviction, he

would have zero points, USSG § 4A1.2(c)(2), and he would be in Criminal History Category I,

USSG §§ 4A1.1, 5A. In addition, the defendant through counsel quickly expressed a desire to

plead guilty, acknowledge his conduct, and promptly resolve his case. When recommending an

appropriate sentence, the government gives significant weight to the defendant's early resolution

of this case. This factor supports a more lenient sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack

on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6

showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[5] Consequently, this factor supports a sentence of

incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in

misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr.

8/4/2021 at 3 ("As to probation, I don't think anyone should start off in these cases with any

presumption of probation. I think the presumption should be that these offenses were an attack on

our democracy and that jail time is usually -- should be expected." (statement of Judge Hogan)).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).  Here, both goals will be best served by a significant sentence of home detention and probation.

    *General Deterrence*

    The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

    The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant's conduct demonstrates a need for specific deterrence. The defendant walked past shattered glass on the floor of the Capitol when he unlawfully entered with a horde of rioters, he knew the police had deployed tear gas, and he ignored the blaring alarm resonating through the Capitol. Even more troubling, he recorded these harrowing events on his cell phone. And he sat by while his wife and co-defendant made misleading statements to the FBI.

In addition, certain facts suggest that the defendant attempted to destroy or conceal highly incriminating videos taken inside the Capitol. As noted above, Thomas indicated through counsel that he was not actually recording video inside the Capitol, but some videos from Thomas inside the Capitol were recovered pursuant to a warrant for his Facebook, and his phone was purportedly destroyed shortly after the FBI contacted the Vinsons. The government has no definitive proof that Thomas intentionally concealed evidence. Nevertheless, these circumstances merit the Court's consideration.

On balance, the defendant's need for specific deterrence appears to be somewhat less than his co-defendant's, but a need remains.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the

Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the latter category.

Here, to avoid unwarranted sentencing disparities, the Court should also consider the sentence to be imposed on Lori Vinson, who is set to be sentenced on the same day. Their conduct

---

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

on January 6, 2021, was similar, but multiple search warrants and interviews in this case did not reveal the kind of propaganda and minimization of the violence by Thomas Vinson that Lori Vinson engaged in. On the other hand, the facts surrounding the disappearance of the phone and videos Thomas took inside the Capitol raise concerns. Lori also agreed to cooperate with further investigation, and ultimately, both defendants accepted the first plea offer extended to them. On balance, the primary difference between these defendants is their statements after the fact, which warrant a more significant sentence for Lori Vinson than for Thomas Vinson.

## V.      Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Thomas Vinson to three months' home detention, three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty and lengthy supervision as a consequence of his behavior, while recognizing his early acceptance of responsibility.


Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By:     MARY L. DOHRMANN
NY Bar No. 5443874
Assistant United States Attorney
Federal Major Crimes Section

U.S. Attorney's Office
555 4th Street, N.W., Room 4826
Washington, D.C.  20530
Office: 202-252-7035
Mary.Dohrmann@usdoj.gov